IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


FRED TURNER, Administrator )
for the Estate of Lawrence )
Turner, deceased,          )
                           )
                           )
     Plaintiff,            )
                           )        CIVIL ACTION NO.
     v.                    )        2:22cv624-MHT
                           )             (WO)
JEFFERSON S. DUNN, Alabama )
Prison Commissioner,       )
et al.,                    )
                           )
     Defendants.           )


OPINION AND ORDER

This lawsuit stems from the death of Lawrence Turner

while he was a prisoner at the Bullock Correctional

Facility, an Alabama Department of Corrections (ADOC)

facility.  Plaintiff Fred Turner, the administrator of

decedent Turner's estate, brings this lawsuit against two

Bullock correctional wardens in their individual

capacities: Patrice Jones and David Lamar.[1]

---

    1. Plaintiff also names Jefferson S. Dunn as a
defendant.  Dunn was the ADOC commissioner at the time

Plaintiff asserts two counts in his amended complaint. In Count 1, he claims that Wardens Jones and Lamar failed to protect decedent from a substantial risk of serious harm, in violation of the Eighth and Fourteenth Amendments, as enforced through 42 U.S.C. § 1983. And, in Count 2, he seeks to hold them liable under Alabama's wrongful-death statute, again for their failure to protect decedent. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental).

Before the court is the wardens' motion to dismiss. They argue that the two claims against them are barred by qualified immunity. They also contend that the amended complaint should be dismissed as an impermissible shotgun pleading. For the reasons below, their motion will be denied as to Count 1 and granted as to Count 2.

---

of decedent's death. Dunn is addressed in a separate order.

## I.   MOTION-TO-DISMISS STANDARD

Wardens Jones and Lamar bring motions to dismiss under subpart (b)(6) of Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.  In considering a motion to dismiss, the court accepts the plaintiff's factual allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).

## II. BACKGROUND

The facts alleged in the amended complaint, taken in the light most favorable to plaintiff administrator, are as follows.

In 2016, the United States Department of Justice (DOJ) opened an investigation into suspected Eighth Amendment violations at ADOC's male correctional

facilities, including Bullock Correctional Facility. After a three-year investigation, DOJ issued a report on the conditions in the male prisons in April 2019, and a supplemental report in July 2020 further detailing those conditions.[2] The 2019 and 2020 reports were specifically provided to ADOC officials.

---

2. The 2019 report is available at U.S. DOJ, *Investigation of Alabama's State Prisons for Men* (April 2, 2019), https://perma.cc/6TRX-B5SJ, and the 2020 report at U.S. DOJ, *Investigation of Alabama's State Prisons for Men* (July 23, 2020), https://perma.cc/VP7B-29L5. Because plaintiff incorporated the reports by reference, the court will consider them in deciding this motion. "In general, if it considers materials outside of the complaint, a district court must convert the motion to dismiss into a summary judgment motion." *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010). But under the exception for documents incorporated by reference, a court may consider an extrinsic document without converting a motion to dismiss into a motion for summary judgment, "if [the document] is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Id.*

Here, both reports are central to plaintiff's claims. Paragraphs 11 through 77 of the amended complaint summarize the reports, often directly quoting them in the process. *Compare* Pl.'s Am. Compl. (Doc. 24) ¶ 58, *and id.* ¶ 61(d), *with* 2019 Report, at 26, *and id.* at 18. Plaintiff explains that the reports show that the wardens had notice of the allegedly dangerous conditions at

4

The amended complaint summarizes the 2019 and 2020 DOJ reports and alleges that ADOC's male correctional facilities suffered from staffing shortages, overcrowding, and rampant inmate-on-inmate physical and sexual violence.    The reports also allege that the available data likely underestimate the prevalence of violence at ADOC facilities, as (1) ADOC lacks a centralized system to track prisoner homicides; (2) prison officials often misclassify prisoner

---

Bullock, which is necessary to establish supervisory liability for plaintiff's Eighth Amendment claim.

Moreover, while defendants challenge the accuracy of the reports, they do not challenge the reports' authenticity.    In fact, they cite the July 2020 report in their brief.    *See* Jones and Lamar Br. (Doc. 30) 4.

The amended complaint also cites to the DOJ's lawsuit against Alabama, which was based on the findings outlined in the reports.    And the record in that case contains the reports.    *See* Special Master Report and Recommendation #2, *United States of America v. Alabama*, No. 20-cv-01971-RDP, (N.D. Ala. Sept. 30, 2023), (Doc. 131-1) Ex. A-B.

Finally, there the court's ability to take judicial notice of the existence of the reports.

homicides as deaths precipitated by natural causes; and (3) prison officials discourage reporting of incidents of violence by retaliating against victims who speak out.

The reports also represented that there were other patterns of dangerous conditions across Alabama prisons including: failure to classify inmates by risk level and house them accordingly; failure to prevent uncontrolled movement of prisoners; lack of adequate supervision; insufficient security cameras and convex mirrors; failure to screen new inmates for contraband, including weapons, drugs, and cell phones; failure to control the manufacture and flow of weapons; failure to respond appropriately to reports of threats; failure to prevent extortion among prisoners; failure to fix broken and defective locks; and failure to provide adequate programming.

Among the prisons investigated by the DOJ was Bullock Correctional Facility, where decedent Turner was incarcerated, and defendants Jones and Lamar were

6

wardens.   Bullock is a medium-security facility built to accommodate 919 inmates.   Around the time of DOJ's investigation, Bullock was operating at over 140 % capacity and had a 60.1% staff vacancy rate.   At least five incidents of inmate-on-inmate violence were reported at Bullock in the years leading up to decedent's death, including three homicides in February 2018, June 2020, and November 2020, a sexual and physical assault in January 2018, and a stabbing in April 2018.   In at least two of these incidents, the victims previously expressed concern for their safety to prison officials.

Furthermore, due to ineffective classification and pervasive misclassification of inmates, the prison routinely failed to separate violent prisoners from non-violent prisoners.   Instead, officers at Bullock routinely placed inmates with histories of violence alongside other inmates, without those histories.

In January 2021, decedent began receiving death threats from several other inmates who were "known" to

be violent.  Am. Compl. (Doc. 24) ¶ 108.  Both decedent
and other inmates notified several guards of concerns
over decedent's safety due to the threats and named the
specific inmates threatening decedent to the guards.
Plaintiff Turner, decedent's brother, also notified
officers at Bullock that decedent was being tortured by
inmates, as well as prison guards.  Despite repeated
warnings, guards at Bullock took no protective action.
Three months after decedent was first threatened, in
April 2021, one or more of the inmates who previously
threatened decedent, physically assaulted him, and he
died from injuries sustained during the attack.


### III. DISCUSSION

**A. Count 1: Plaintiff's Eighth Amendment Claim**

As explained above, in Count 1, plaintiff asserts an
Eighth Amendment claim against Wardens Jones and Lamar
in their individual capacities.  In response, the wardens

argue that the count should be dismissed because they are entitled to qualified immunity.

Qualified immunity insulates government officials from personal liability "for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once officials establish that they were acting within their discretionary authority, which is uncontested here, the court engages in two distinct inquiries to determine whether qualified immunity applies: (1) whether the plaintiff's allegations "make out a violation of a constitutional right," and (2) whether "the right at issue was clearly established at the time of the defendant's alleged misconduct." *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

There are three ways a plaintiff may demonstrate the law was clearly established. *See Sebastian v. Ortiz*, 918

F.3d 1301, 1310 (11th Cir. 2019). First, he may "show that a materially similar case has already been decided." *Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019). Second, he may point to broad statements of legal principles that apply with "obvious clarity to the circumstances." *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Third, he may prove that the conduct was "so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* (citation and quotation marks omitted). Over the years, materially similar cases and broad statements of legal principles have created a foundation of relevant clearly established Eighth Amendment law.

## 1. Plaintiff Asserted Clearly Established Eighth Amendment Law.

The Constitution does not permit prison officials to turn a blind eye to inmate-on-inmate violence. Rather, it mandates that officials "protect prisoners from violence inflicted upon them by other prisoners."

10

*Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). However, not "every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To establish that a prison official violated the Eighth Amendment's prohibition against cruel and unusual punishment, a plaintiff must prove that the official was deliberately indifferent "to a substantial risk of serious harm to an inmate who suffers injury." *Lane v. Philbin,* 835 F.3d 1302, 1307 (11th Cir. 2016). To do so, "a plaintiff must show (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (citation omitted). Deliberate indifference "has both a subjective and an objective component." *Id.* Subjectively, the official must know that his own conduct "put the plaintiff at

11

substantial risk of serious harm." *Wade v. McDade*, 106
F.4th 1251, 1258 (11th Cir. 2024) (en banc).
"Objectively, the official must have responded to the
known risk in an unreasonable manner, in that he or she
'knew of ways to reduce the harm' but knowingly or
recklessly declined to act." *Marbury*, 936 F.3d at 1233
(quoting *Rodriguez v. Sec'y Dept. of Corr.*, 508 F.3d 611,
620 (11th Cir. 2007)).

Because plaintiff's Eighth Amendment claim relies on
supervisory liability, proving it becomes more
complicated. Section 1983, which is the basis for the
claim, does not make supervisors automatically liable for
their subordinates' actions. *See Cottone v. Jenne*, 326
F.3d 1352, 1360 (11th Cir. 2003). "Instead, supervisory
liability under § 1983 occurs either when the supervisor
personally participates in the alleged unconstitutional
conduct or when there is a causal connection between the
actions of a supervising official and the alleged
constitutional deprivation." *Id.*

12

A plaintiff may establish supervisory liability for a § 1983 Eighth Amendment failure-to-protect claim in at least three ways.

First, a plaintiff may show that "the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citations and quotation marks omitted). Here, plaintiff has not made such allegations.

Second, a plaintiff may prove a "history of widespread abuse put[] the reasonable supervisor on notice of the need to correct" the asserted constitutional violation, but the supervisor failed to do so. *Id*. (citation and quotation marks omitted). Usually, to plead an Eighth Amendment claim, a plaintiff must establish that an official was deliberately indifferent to a specific threat the victim faced. However, in some cases officials may be liable for their deliberate indifference to a 'generalized risk of violence' or 'history of widespread abuse.' *See*, *e.g.*,

13

*Marbury*, 936 F.3d at 1235; *Brown v. Dunn*, 760 F. Supp. 3d 1326 (M.D. Ala. 2024) (Thompson, J.).

Generally, to establish liability for a history-of-widespread-abuse claim (also known as a generalized-risk-of-violence claim), a plaintiff must point "to specific features of a facility or its population" that render it particularly violent. *Id.* In other words, that those particular features "present an objectively substantial risk of serious harm." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc). Next, the plaintiff must show that an official was deliberately indifferent. *See id.* Then, the plaintiff must explain how that official's deliberate indifference to those features caused the injury at issue. *See id.* Here, as explained in more detail later, plaintiff has adequately pled a generalized-risk-of-violence claim.

Third, a plaintiff may show "a supervisor's custom or policy results in deliberate indifference to

constitutional rights." *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006).   In the amended complaint, plaintiff asserts that Wardens Jones's and Lamar's customs or policies were deliberately indifferent to decedent's constitutional rights.   But as plaintiff has already adequately pled a generalized-risk-of-violence claim, the court need not decide whether his assertions would also establish a custom or policy claim.

### 2. Plaintiff Adequately Pled that Decedent's Clearly Established Right Was Violated.

With the amended complaint read in the light most favorable to plaintiff, he has adequately pled a generalized-risk-of-violence claim.

First, plaintiff alleges that decedent Turner faced a substantial risk of serious harm.   Plaintiff begins by asserting ADOC's male prisons had a history of widespread abuse.   As stated previously, he alleges that all of the facilities suffered from: overcrowding; staffing shortages; inadequate supervision; a failure to classify

15

inmates by risk level and house them accordingly; the proliferation of contraband (including weapons, drugs, and cell phones); insufficient security equipment; and broken or defective locks.  He asserts that, because of these conditions, there was rampant inmate-on-inmate physical and sexual violence across ADOC's male prisons. For example, in the fiscal-year before decedent's death, there were at least 16 prisoners killed by other prisoners, and over 1,100 prisoner-on-prisoner assaults.

Plaintiff further alleges that Bullock was part of this widespread abuse, and points to various features that rendered the facility particularly violent.  He describes how Bullock was physically deteriorating, as it had broken and defective locks, which allowed prisoners to often roam freely, and insufficient or broken security cameras and convex mirrors, which prevented guards from monitoring prisoners.  He also contends that, even if Bullock were not deteriorating, guards would have been unable to stop inmate misconduct,

16

for over half (60.1 %) of the staff positions at Bullock were vacant, while it was also overcrowded with inmates at an occupancy rate of 140 %; and that lopsided ratio left too few guards to watch over too many prisoners.

Plaintiff submits that reckless and poorly implemented practices and policies at Bullock heightened the risk of inmate-on-inmate violence. Due to pervasive misclassification many inmates with histories of violence were not housed separately. And, even if they had been properly classified, it would not have made much difference, as Bullock housed everyone in general population together and everyone in restrictive housing together, rather than separating "nonviolent inmates from violent inmates." *Marsh*, 268 F.3d at 1029.

Plaintiff explains how these conditions combined to create an exceptionally dangerous environment at Bullock. Guards failed to screen new inmates for contraband, and as a result the facility was flooded with, weapons, drugs, and cell phones. Those weapons and drugs not

17

imported would be manufactured at Bullock by prisoners inadequately supervised by short-staffed guards equipped with insufficient security cameras and convex mirrors. Guards then failed to control the flow of those weapons, drugs, and cell phones, which readily made their way through doors secured with broken and defective locks, and into the hands of other prisoners.

This risk of substantial harm was not just theoretical; it materialized into actual harm at Bullock. Inmates used cell phones to extort other inmates and their families. Sexual and physical violence was commonplace, often involving the use of prevalent weapons. The amended complaint also provides two examples of homicides that occurred in the ten months leading to decedent's death. Plaintiff also contends that the actual number of homicides during that time may be much higher, as Bullock routinely misclassifies prisoner deaths. This misclassification problem is in turn made worse by ADOC's lack of a centralized

18

classification system for reporting prisoner deaths. For
example, it is alleged that one of the two previously
referenced homicides was unreported.

According to the amended complaint, the many alleged
incidents of inmate-on-inmate violence that did not
result in death, also faced reporting problems. As
explained above, in the fiscal-year before decedent
Turner's death, there were over 1,100 inmate-on-inmate
assaults in ADOC male prisons. What proportion of those
assaults occurred at Bullock, the month-to-month
breakdown of those assaults, and whether there are many
other unreported assaults is unclear, in part, because
of ADOC's own actions. ADOC curbed public reporting of
serious inmate-on-inmate violence in the months after DOJ
issued its first report. Moreover, ADOC did not have a
grievance system to report when guards improperly
responded to incidents or threats of inmate-on-inmate
violence, which also made proper reporting difficult.
And that lack of a grievance system was in turn made

worse, because officials at Bullock allegedly discouraged reporting of incidents and threats of violence through retaliation.

The Eleventh Circuit Court of Appeals has consistently determined that features like those that plaintiff alleges occurred at Bullock pose a substantial risk of serious harm. In *Marsh v. Butler County*, the appellate court found that a jail that did not separate violent and nonviolent inmates, and which suffered from overcrowding, routine understaffing, broken locks, inadequate mental health screening, and uncontrolled flow of weapons posed an "objectively substantial risk of serious harm." 268 F.3d at 1029. The appellate court concluded the same in *Hale v. Tallapoosa County*, for a jail that was overcrowded, failed to classify and separate violent inmates, and inadequately supervised inmates. 50 F.3d 1579, 1583 (11th Cir. 1995). And more

20

recently, in *Dickinson v. Cochran*,[3] the Eleventh Circuit
found that a prison that "routinely housed dangerous
inmates in crowded conditions with non-violent inmates,
allowed the introduction of contraband by improperly
searching inmates, and inadequately supervised inmates"
posed a substantial risk of serious harm.  833 F. App'x
268, 272 (11th Cir. 2020) (internal quotation marks
omitted).

Second, plaintiff has adequately pled that Wardens
Jones and Lamar were deliberately indifferent to this
substantial risk of serious harm to inmates at Bullock.
They were subjectively aware that their conduct posed a
substantial risk of serious harm to inmates at the
facility.  According to the amended complaint, they were
notified of the history of widespread abuse at the

---

3. While an unpublished case like *Dickinson* cannot
itself be relied upon to define clearly established law
for purposes of qualified immunity, *see J W by & through
Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248,
1260 n.1 (11th Cir. 2018), it is nonetheless persuasive
as to how a court in the Eleventh Circuit would apply law
already clearly established.

facility by the DOJ reports, both of which were sent to the officials. *See Dickinson*, 833 F. App'x at 270-73 (involving notice through a letter sent by DOJ); *Marsh*, 268 F.3d at 1029 (involving notice given, in part, through reports on jail conditions and lawsuits). The DOJ reports provided illustrative (but not exhaustive) examples of inmate-on-inmate violence and inmate access to contraband at Bullock. The reports also detailed *patterns* of facility deterioration, staffing issues, overcrowding, violence, and dangerous policies, across *all* the prisons investigated. As Bullock was one of the prisons investigated and discussed by the DOJ, the report provided notice of the conditions at the facility. *See Dickinson*, 833 F. App'x at 270-73.

Plaintiff has demonstrated that Wardens Jones's and Lamar's responses were objectively unreasonable, as they knowingly or recklessly failed to remedy the conditions at Bullock. The amended complaint asserts that they, as wardens at the facility, were responsible for the

conditions there. Yet, according to the amended complaint, in the two years following DOJ's first report until decedent was killed, they knew about the widespread abuse at the facility and failed to correct it. More specifically, plaintiff contends that they took no action in response, and implicitly offers several specific, concrete actions Wardens Jones and Lamar could have taken to remedy the conditions at Bullock. For example, changing the classification and housing policies; remedying the staffing shortages and overcrowding; fixing the broken, defective, or inadequate locks, mirrors, and cameras; and establishing a grievance system to report when guards improperly respond to incidents or threats of inmate-on-inmate. Plaintiff's assertions, taken as true and in the light most favorable to him, would reflect that Wardens Jones and Lamar were deliberately indifferent. *See*, *e.g.*, *Hale*, 50 F.3d at 1584-85 (finding that a sheriff's "failure to take meaningful action" to address overcrowding, inadequate guard

23

supervision, and inmate violence amounted to deliberate indifference); *id*. at 1583-84 (stating that the sheriff's failure to pursue reasonable measures, such as "classifying and segregating the inmates based on their likelihood for violence," demonstrated deliberate indifference).

Finally, plaintiff has shown how Wardens Jones's and Lamar's deliberate indifference to the specific features at Bullock caused the decedent's death.  Plaintiff asserts that decedent Turner was yet another victim of the widespread abuse at the facility.  In January 2021, several other inmates with a reputation for being violent began threatening Turner's life.  Fearful for his life, decedent told the guards at the facility about the death threats, and in doing so he named the specific inmates who were threatening him.  The under-staffed and under-equipped guards did nothing in response.  According to the amended complaint, for the next three months, decedent (and later other concerned inmates as well)

continued to seek help from the guards at Bullock. Those threats began to materialize, and so, plaintiff Turner, decedent Turner's brother, reported to several administrative officers at the facility that decedent was being tortured by the inmates and other guards. The amended complaint states that despite these repeated pleas, help never came, and, as a result, in April 2021, decedent was attacked by the inmates who previously threatened him. He died a month later from injuries caused by the attack.

Plaintiff alleges that, because of the conditions at Bullock, the inmates who repeatedly threatened decedent Turner's life were put in a position where they could attack him. Insufficient staffing, ineffective classification, overcrowding, defective locks, and inadequate security cameras and convex mirrors made it particularly easy for those inmates to harm decedent, as guards were ill equipped to respond to any threats. And Warden Jones's and Lamar's failure to implement a

25

centralized grievance system for improper responses to threats of violence made it harder to report the guards' failure to respond to the threats against decedent, as well as the inmates and guards alleged torturing of decedent.

Still, Wardens Jones and Lamar make several arguments for why plaintiff's allegations do not establish a violation of clearly established law. First, they point to several Eleventh Circuit cases involving inmate-on-inmate violence, where the plaintiff did not meet the generalized-risk-of-violence standard. They chiefly rely on *Marbury v. Warden*, which involved a plaintiff who repeatedly asked to be transferred because he feared for his safety. *See* 936 F.3d at 1231. In his letters to the warden seeking a transfer, plaintiff mentioned witnessing 15 stabbings in his cell block. *See id.* at 1231-32. After two months of being repeatedly denied a transfer, plaintiff was stabbed by another inmate. *Id.* Plaintiff sued the warden, asserting the

warden had been put on notice of a history of widespread abuse (the 15 stabbings) and that the warden's deliberate indifference to those stabbings caused plaintiff to be stabbed. *See id.* at 1234-35. The Eleventh Circuit stated that the 15 stabbings, standing alone, were not sufficient to demonstrate the prison was one "where violence and terror reign." *Id.* at 1234. Wardens Jones and Lamar correspondingly argue that, because plaintiff gives only a few examples of violence at Bullock, he has not demonstrated that the facility was one where violence and terror reign.

Wardens Jones and Lamar misunderstand *Marbury*. *Marbury* does not establish that to prove a generalized-risk-of-violence claim, violence must be so commonplace that violence and terror reign. Rather, *Marbury*'s violence-and-terror standard only "applies where a plaintiff alleges only a generalized risk and points to no 'specific features of a facility or its population rendering it particularly violent.'"

27

*Dickinson*, 833 F. App'x at 275 (discussing *Marbury*, 936 F.3d at 1235).  "*Marbury* merely suggests that evidence of a reign of violence and terror would be one way to establish deliberate indifference; it is does not say it is the only way."  *Brown v. Dunn*, 760 F. Supp. 3d 1340 (M.D. Ala. 2024) (Thompson, J.).  When a plaintiff points to "specific features of [a facility] that render it particularly violent," *Dickinson*, 833 F. App'x at 275, and thus "has alleged more than a generalized risk of violence," *id*., the plaintiff need not prove a reign of terror and violence.  *See id.*; *see also Marsh*, 268 F.3d at 1034 (finding that, because of the dangerous conditions at the facility, defendant was deliberately indifferent even though "no serious injury was alleged to have [previously] occurred").  In such cases, the specific features help explain how a defendant's deliberate indifference caused the injury.

Finally, Wardens Jones and Lamar argue that plaintiff has not demonstrated the necessary causal connection for

supervisory liability because he has not adequately pled that they were told of the specific threats on decedent's life. However, "[plaintiff] was not required to show that [defendants] knew 'precisely who would attack whom,' but only that [they] had subjective knowledge of a generalized, substantial risk of serious harm from inmate violence." *Hale*, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 844). And here, plaintiff made that showing.

### B. Count 2: Plaintiff's Wrongful-Death Claim

The court now turns to Count 2, in which plaintiff claims that Wardens Jones and Lamar violated Alabama's wrongful-death statute.

Under the traditional-common-law rule, an injured party's personal tort claims abate upon his death. *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978). In other words, there is no survivorship under the traditional common-law rule. *See id.* Unsatisfied with that harsh rule, Alabama passed a wrongful-death statute, which

29

permits survivorship when a decedent's death is caused by "the wrongful act, omission, or negligence of any person, persons, or corporation," Ala. Code § 6-5-410(a). *See Simmons v. Pulmosan Safety Equip. Corp.*, 471 F. Supp. 999, 1001 (S.D. Ala. 1979) (Thomas., J.). Here, plaintiff contends that Wardens Jones's and Lamar's Eighth Amendment violation was a wrongful act or omission that caused decedent's death. While plaintiff asserts Count 2 as a separate count from Count 1, Count 2 is redundant, for it just reasserts the claim in Count 1.

To understand why Count 2 is redundant, it helps to provide some explanation about why plaintiff may assert Count 1, his § 1983 Eighth Amendment claim. The Eleventh Circuit has explained that, "[b]y its terms, 42 U.S.C. § 1983 does not provide for the survival of civil rights actions." *Est. of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1045 (11th Cir. 2011). "Due to this 'deficiency' in the statute, the survivorship of

30

civil rights actions is governed by 42 U.S.C. § 1988(a)."
*Id.* Section 1988(a) "generally directs that, where federal law is 'deficient,' the state law of the forum applies," so long as that law is not inconsistent with federal law. *Id.* (quoting 42 U.S.C. § 1988(a)).

Generally, "the applicable Alabama survivorship law is Ala. Code § 6-5-462," which requires that a decedent's unfiled tort claims abate upon his death. *Id.* at 1046 (cleaned up). If this survivorship statute were to apply, then decedent Turner's Eighth Amendment claim would not survive his death. *See id.*

However, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful-death statute, Ala. Code § 6-5-410." *Id.* at 1047 (cleaned up). To permit otherwise would allow a state actor to "escape § 1983 liability by killing off the victim," thereby undermining the "deterrent purposes of the statute." *Id.* at 1048 n.10.

31

Here, as already discussed, Wardens Jones's and Lamar's constitutional violation allegedly proximately caused decedent's death; therefore, plaintiff may use Alabama's wrongful-death statute to resolve the deficiency and resurrect decedent's § 1983 Eighth Amendment claim. *See id.* at 1047-48, 1047 n.9. In essence, he can claim that the wardens' "Eighth Amendment violation (Count 1) also violates the wrongful-death statute (Count 2), which contains a survivorship provision incorporated through § 1988(a), allowing plaintiff to assert decedent's § 1983 claim (Count 1). As plaintiff's § 1983 claim is based on a violation of the wrongful-death statute, Count 2 is just repeating the claim in Count 1."[4] *Brown*, 760 F. Supp. 3d at 1342.

---

4. Wardens Jones and Lamar also argue Count 2 is barred by state-agent immunity, but as this section explains, Count 2 just repeats Count 1. And as an Alabama state court has correctly recognized, such immunity does not apply to federal claims like the one asserted in Count 1. *See King v. Corr. Med. Servs., Inc.*, 919 So. 2d 1186, 1191 (Ala. Civ. App. 2005); *see also Brown*, 760 F. Supp. 3d at 1342 (state-agent immunity does not apply to § 1983 federal claims).

Accordingly, Count 2 will be dismissed, albeit without prejudice, as redundant.

### C. Wardens Jones and Lamar's Shotgun-Pleading Assertion

The court now turns to Wardens Jones and Lamar's final argument: that the amended complaint should be dismissed as it constitutes an impermissible "shotgun pleading," in violation of Federal Rules of Civil Procedure 8(a)(2) and 10(b). A complaint is a "shotgun pleading" when it presents claims in a manner in which a defendant cannot "discern what [the plaintiff] is claiming and frame a responsive pleading." *T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1533 n.14 (11th Cir. 1985). At bottom, the complaint must "give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015).

33

The Eleventh Circuit has recognized at least four types of shotgun pleadings: first, "a complaint containing multiple counts where each count adopts the allegations of all preceding counts" into each subsequent count, which is the most common type of shotgun pleading, *id.* at 1321; second, "a complaint ... replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action" *id.* at 1322; third, a complaint that fails to separate "each cause of action or claim for relief" into a different count, *id.* at 1323; and, fourth, a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," *id.* Wardens Jones and Lamar argue that the amended complaint falls into the first, second, and fourth types.

Wardens Jones and Lamar contend the amended complaint falls into the first category of shotgun pleading because

34

"each count reincorporate[s] and adopt[s] the previous paragraphs." Jones and Lamar Br. (Doc. 30) 6. This argument misunderstands the first category, which is not *just* about repeating the same allegations from preceding counts; it is about the incorporation of "*irrelevant factual allegations and legal conclusions*" into subsequent counts. *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002) (emphasis added). In essence, the first category is attempting to address an issue where defendants would have "difficulty knowing what they were alleged to have done and why they were liable for doing it" because by incorporating all the preceding allegations plaintiff would also incorporate irrelevant or immaterial allegations. *Weiland*, 792 F.3d at 1324. Such a concern is inapplicable to the amended complaint, because, as discussed above, the reason plaintiff repeats the allegations is that he is repeating the same claim in two separate counts. So, while Count 2 is due to be

dismissed as redundant, this complaint is not the type covered by the first category of shotgun pleading as the assertions made are *relevant* to both counts.

Wardens Jones and Lamar also argue the amended complaint fits into the second category of shotgun pleading, which covers complaints "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland*, 792 F.3d at 1322. They urge that many of the amended complaint's assertions are either vague and conclusory or not specific to the Bullock facility or decedent's death. On the contrary, as explained above, the facts asserted in the amended complaint are concrete, detailed, and material to plaintiff's claims. While the amended complaint begins by outlining a history of alleged defects across all of ADOC's male prisons (which of course includes Bullock), it then discusses the specific conditions at Bullock, and the circumstances of decedent's death. Those systemic allegations provide

36

necessary background for the Bullock-specific allegations and shed light on Wardens Jones's and Lamar's knowledge of the substantial risks associated with the conditions at Bullock.

Finally, Wardens Jones and Lamar assert that the amended complaint belongs in the fourth category.  This category addresses complaints that assert "multiple claims against multiple defendants without specifying" which defendant is responsible for which actions or specifying which defendant each claim is directed toward. *Id.* at 1323.  Wardens Jones and Lamar contend that the amended complaint does not distinguish between the named defendants.  Instead, they contend that it only refers to them and Jefferson Dunn, the third named defendant (who is not discussed in this opinion), jointly as "Defendants Dunn, Jones and Lamar," without specifying which defendant engaged in each action.[5]  Jones and Lamar Br. (Doc. 30) 7.  This argument misunderstands the fourth

---

5. *See* note 1 *infra* (discussing Dunn).

category, which concerns cases where no specific
defendants are named, not where all the defendants are
explicitly named, and the allegations apply to all of
them. In essence, defendants contend that the amended
complaint implicitly asserts all the named defendants
shared the same knowledge and took the same actions.
However, that contention is a dispute over whether the
allegations are true, not whether they are
comprehensible.

"Comprehension, not perfection, is the standard of
the pleading rules." *Brown*, 760 F. Supp. 3d at 1344.
And, in this case, plaintiff's amended complaint is
sufficiently comprehensible so as not to be a shotgun
pleading.


## IV. CONCLUSION

For the above reasons, Wardens Jones and Lamar's
dismissal motion will be denied as to Count 1 and granted
as to Count 2. The court emphasizes that it has relied

38

on only plaintiff's allegations, and it has found only that the plaintiff may proceed with discovery. Whether the evidence supports those allegations is not before the court at this time. And, as discovery has not yet begun, whether the evidence supports the conclusion Wardens Jones and Lamar were deliberately indifferent is also not before the court at this time.

                              ***

    Accordingly, it is ORDERED that:

    (1) Defendants Patrice Jones and David Lamar's motion to dismiss (Doc. 29) is denied as to Count 1.

    (2) Said motion is granted as to Count 2, and said count is dismissed without prejudice.

    DONE, this the 7th day of July, 2025.

                         /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE

39